IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| RONDELL VEAL, | : | |
| --- | --- | --- |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| AMERICAN HEARING AID | : | |
| ASSOCIATES, INC., | : | No. 17-1738 |
| Defendant. | : | |

## MEMORANDUM

**Schiller, J.**                                                                                                                                                                                    **July 30, 2018**

      Rondell Veal was fired from his job at American Hearing Aid Associates, Inc. ("AHAA") several months after he began to complain of racial discrimination and shortly after several coworkers reported that Veal had engaged in harassing behavior. After withdrawing his racial discrimination and hostile work environment claims, Veal's only remaining claims are retaliation under: (1) Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; (2) 42 U.S.C. § 1981; and (3) the Pennsylvania Human Relations Act, 43 P.S. § 951 *et seq.* ("PHRA"). AHAA moves for summary judgment. For the following reasons, the motion is granted.

## I. BACKGROUND

      Veal began working at AHAA as a sales representative in June 2016 following a strong interview with Stephanie Scott-Boyes, who became his supervisor. (*See* Def.'s Statement of Undisputed Material Facts ¶¶ 5–9, 17.) Scott-Boyes is Caucasian. (*Id.* ¶ 4.) Veal is African-American. (*Id.* ¶ 2.)

      After initially performing well, Veal became embroiled in several disputes with coworkers. (*See, e.g.*, Pl.'s Counter Statement of Material and Disputed Facts ¶¶ 6, 9, 31–33, 37.)

On August 25, 2016, Veal confronted Scott-Boyes over an error in promotional materials he had been using. (Def.'s Statement of Undisputed Material Facts ¶¶ 36–37.) Rather than speak with Veal in the open office area, Scott-Boyes asked to talk with Veal privately in the lunch room. (*Id.* ¶¶ 39–40.) There, according to Veal, Scott-Boyes began a "verbal bombardment." (Pl.'s Counter Statement of Material and Disputed Facts ¶ 9.) In response to being yelled at, Veal "started putting [his] head down." (Def.'s Mot. for Summ. J., Ex. A ("Veal Dep.") at 119:11–12.) Scott-Boyes then told Veal, "You need to watch how your face looks," and asked, "Did you get knocked upside your head a lot as a kid?" (Pl.'s Counter Statement of Material and Disputed Facts ¶ 10.)

Veal explained at his deposition that he thought Scott-Boyes' treatment of him was "racist" because "I've been a manager before and you don't talk to people that way." (Veal Dep. at 133:15–18.) He characterized Scott-Boyes as acting "like a young white woman in a room with a black man by herself" and having "a hissy fit." (*Id.* at 133:20–22.) Veal claims that he had not seen Scott-Boyes treat non-African-American coworkers in the same way. (Pl.'s Counter Statement of Material and Disputed Facts ¶ 11.)

On August 29, 2016, Veal asked to speak with Scott-Boyes about the confrontation. (Def.'s Statement of Undisputed Material Facts ¶ 53.) He told Scott-Boyes that her comments on August 25 were "unprofessional" and "absurd." (*Id.* ¶ 54.) Scott-Boyes then consulted Ernie Paolini, the director of human resources, and asked him to supervise the rest of their conversation. (*Id.* ¶¶ 55–56.) Veal repeated his belief to Paolini that Scott-Boyes had acted unprofessionally, but did not attribute her behavior to any bias. (*Id.* ¶¶ 57–58.) Paolini

reprimanded Veal for his "insubordinate" behavior. (*Id.* ¶ 61.) From that point on, Veal felt ostracized by his coworkers.[1] (*Id.* ¶¶ 62–63.)

On September 15, 2016, Veal complained of racial discrimination for the first time. Referencing the August 25 altercation with Scott-Boyes and subsequent meeting, he wrote to Paolini and Jodi Bryan, a human resources manager:

> I have not received any follow up from either Stephanie [Scott-Boyes] or Ernie [Paolini] since our meeting. What I have instead received since said meeting has been very blatant and deliberate isolation techni[que]s coinciding with "whiteboard messages" that encouraged more isolation and other discriminative words and tactics. After Stephanie's actions and words on 8/25/16 along with much thought and weeks now of going through several discriminative actions and comments, from coworkers that should not have any knowledge of our meeting, I now see and feel my race and background are playing part in my current treatment at AHAA. I feel that after the comments that were made to me by Stephanie on 8/25/16 that were very offensive, discriminative and inexcusable especially in a work environment from your supervisor, and the support I did not receive when I expressed how uncomfortable I felt that day when I repeated them to Ernie on 8/29/16, my work environment has now become unprofessional and hostile towards me. I am asking HR for a prompt response and proper support in regards to correcting these current discriminations. Thank you!

(Def.'s Mot. for Summ. J., Ex. M.)

Bryan and Tina Soika, the president of AHAA, met with Veal shortly after he sent the email to discuss the alleged discrimination. (*See* Def.'s Statement of Undisputed Material Facts ¶ 84; Def.'s Mot. for Summ. J., Ex. O.) Soika told Veal that AHAA did not condone discrimination and that Bryan would investigate his claims. (Def.'s Statement of Undisputed Material Facts ¶¶ 86–87.) Veal left the meeting feeling reassured, but he continued to feel ostracized by his coworkers. (*See id.* ¶¶ 88–89.) After interviewing the employees involved,

---

[1] In his deposition, Veal referenced several other instances of perceived discrimination, including coworkers ignoring him, rolling their eyes at him, and one coworker posting a Dr. Martin Luther King Jr. quotation on a whiteboard by her cubicle. Veal has not included these allegations in his statement of material facts or relied on them in his opposition to summary judgment and the Court agrees that they are not pertinent. In any event, those allegations do not imply any racial discrimination.

Bryan concluded that Scott-Boyes had acted unprofessionally during the August 25 meeting. (Def.'s Mot. for Summ. J., Ex. P.) She counseled Scott-Boyes on appropriate workplace conduct and told Veal that a human resources representative would participate in any future meetings between Veal and Scott-Boyes. (*Id.*) Bryan could not confirm Veal's other complaints. (*Id.*)

Veal continued to feel shunned by his coworkers, which he attributed to his race and gender. (*See, e.g.*, Veal Dep. at 216:14–217:14 (stating that as a man in a sales role, he would "get certain looks" and that his female coworkers "had . . . less respect" for him).) In early November 2016, Veal and a coworker had a loud disagreement that prompted a manager to send them to human resources to resolve the dispute. (Def.'s Statement of Undisputed Material Facts ¶¶ 119–20.) Veal did not attribute that dispute to racial bias. (*See id.* ¶ 126.)

On November 11, 2016, Veal confronted a different coworker, who he believed was "gossiping" about him. (*Id.* ¶ 128.) Veal did not know why the coworker, who is African-American, was talking about him, but he did not attribute the issue to bias or discrimination. (*Id.* ¶¶ 65, 136.) He told the coworker, "don't be cowardly," and suggested that his coworker's wife would disapprove of him "walking around, palling around with a bunch of women laughing at another man." (*Id.* ¶¶ 129–31.) The coworker apologized and then sent an email to Bryan, the human resources manager, to report the incident. (*Id.* ¶¶ 135, 137.) He wrote that he "just had a very disturbing conversation with Rondell [Veal]" that "concern[ed] me very much." (Def.'s Mot. for Summ. J., Ex. S.) He recounted being cornered by Veal and wrote, "I can't say I was threatened but I did not feel exactly safe." (*Id.*) Less than an hour later, another employee emailed Bryan to report the incident. (*See* Def.'s Mot. for Summ. J., Ex. T.) She described Veal as "speaking and acting very aggressively" and "being very threatening." (*Id.*) She noted that she "actually waited around the corner to listen if anything physical would happen." (*Id.*)

4

That same day, a third employee told Bryan about an incident from months earlier in which Veal seemed "erratic" and "enraged." (Def.'s Statement of Material Facts ¶ 141.) Bryan told her to write down any complaints and send them to her by email. (Pl.'s Counter Statement of Material and Disputed Facts ¶ 43.) The employee reported "a pattern of . . . very erratic aggressive behavior," including one incident out of the office where Veal had called her "a ghetto bitch." (Def.'s Mot. for Summ. J., Ex. V.)

Veal was suspended with pay that day. (Pl.'s Counter Statement of Material and Disputed Facts ¶ 44.) He was told that his suspension was necessary for AHAA to "get to the bottom of what's going on." (*Id.*) Three days later, Veal was fired. (Def.'s Statement of Material Facts ¶¶ 146–47.) Veal was not interviewed prior to his termination or told why he had been fired. (Pl.'s Counter Statement of Material and Disputed Facts ¶¶ 46–47.)

Veal sued AHAA, asserting claims of racial discrimination, hostile work environment, and retaliation under Title VII, § 1981, and the PHRA. He has since withdrawn the racial discrimination and hostile work environment claims. (Pl.'s Opp'n to Def.'s Mot. for Summ. J at 2, n.1.)

## II. STANDARD OF REVIEW

Summary judgment is appropriate when the admissible evidence fails to demonstrate a genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). When the movant does not bear the burden of persuasion at trial, it may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry its burden of persuasion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

Thereafter, the nonmoving party demonstrates a genuine issue of material fact if it provides evidence sufficient to allow a reasonable finder of fact to find in its favor at trial. *Anderson*, 477 U.S. at 248. In reviewing the record, a court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Prowel v. Wise Bus. Forms, Inc.*, 579 F.3d 285, 286 (3d Cir. 2009). A court may not, however, make credibility determinations or weigh the evidence in considering motions for summary judgment. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

## III. DISCUSSION

Veal asserts retaliation claims under Title VII, § 1981, and the PHRA. Title VII's anti-retaliation provision states: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice . . . ." 42 U.S.C. § 2000e–3(a). Section 1981 and the PHRA similarly prohibit retaliating against an employee for opposing unlawful discrimination. *See McClain v. Avis Rent A Car Sys., Inc.*, 648 F. App'x 218, 222 (3d Cir. 2016); 43 P.S. § 955(d). Because the same standard applies to Title VII, § 1981, and PHRA claims, the Court will analyze the claims together. *See Aguiar v. Morgan Corp.*, 27 F. App'x 110, 112 (3d Cir. 2002).

Under the burden-shifting test, the plaintiff must first establish a prima facie case of retaliation by producing evidence that: (1) he engaged in a protected activity; (2) the employer took an adverse employment action against him; and (3) there was a causal connection between his participation in the protected activity and the adverse employment action. *Moore v. City of Phila.*, 461 F.3d 331, 340–41 (3d Cir. 2006). Once the plaintiff has established a prima facie case

of retaliation, the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for its actions. *Id.* at 342. If the defendant does so, the burden shifts back to the plaintiff to show that the defendant's proffered reason was merely pretextual. *Id.* To defeat a motion for summary judgment, the plaintiff must produce some evidence that would allow a jury to conclude that the defendant's proffered reason was false or that retaliation was the real reason for the adverse action. *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

### A. Prime Facie Stage

As part of the prima facie case, a plaintiff must have engaged in a "protected activity" by participating in certain Title VII proceedings or opposing unlawful discrimination. *Moore*, 461 F.3d at 341. The plaintiff must have an "objectively reasonable belief, in good faith, that the activity [he] oppose[s] is unlawful under Title VII." *Id.* The plaintiff is not required, however, to "prove the merits of the underlying discrimination complaint." *Id.* "To put it differently, if no reasonable person could have believed that the underlying incident complained about constituted unlawful discrimination, then the complaint is not protected." *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 322 (3d Cir. 2008); *see also Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001) (per curiam) (rejecting retaliation claim because "[n]o reasonable person could have believed that the single incident" complained about "violated Title VII's standard" for sex discrimination).

AHAA asserts that Veal has not established a prima facie case of retaliation because he did not engage in a protected activity. Specifically, AHAA argues that the mistreatment complained about by Veal cannot be reasonably viewed as racial discrimination at all. Veal contends that Scott-Boyes' behavior was discriminatory, particularly because he did not observe her treating non-African-American employees in the same way. Although Veal now focuses on

his email characterizing the August 25 confrontation with Scott-Boyes as discriminatory, he asserts that he continued to complain afterwards.

The facts of this case are analogous to *DeLuzio v. Family Guidance Center of Warren County*, Civ. A. No. 06-6220, 2010 WL 1379766 (D.N.J. Mar. 30, 2010). There, the plaintiff reported that a supervisor was "extremely condescending, belligerent, [and] confrontational" and ultimately complained of gender and racial discrimination. *Id.* at *2, 5. When asked by management to explain how her supervisor was discriminating against her, the plaintiff stated only that she was treated "'differently,' but could not provide details or facts to explain the alleged disparate treatment." *Id.* at *13. The court held that the plaintiff had not made out a prima facie case of retaliation because her "complaints were not specifically tied to any discriminatory practices" and were "generally in the nature of the way [her supervisor] spoke to, and treated, her." *Id.* In essence, the fact that her supervisor was of a different race could not transform complaints of merely unprofessional behavior and general allegations of discrimination into protected conduct.

Similarly, in *Dykes v. Marco Group, Inc.*, a court in this District held that a plaintiff had not engaged in a protected activity where the coworker's conduct was not clearly related to any discrimination. 222 F. Supp. 3d 418 (E.D. Pa. 2016). In that case, the plaintiff alleged that a coworker told him, "We don't like your kind here," and complained of other unspecified discrimination. *Id.* at 422. When asked to explain at his deposition how specifically he had been discriminated against, the plaintiff said only, "Why else would I be fired?" *Id.* at 432. The court granted the defendant's motion for summary judgment, finding that "no reasonable juror could conclude that [the coworker's] statement, which is not obviously racial, violated Title VII's prohibitions on discrimination." *Id.*

*DeLuzio* and *Dykes* are instructive. Scott-Boyes' comments plainly did not reference race or imply any racial bias. In his deposition, Veal was unable to provide any additional evidence of discrimination or racial bias. When asked to explain how Scott-Boyes comments' were discriminatory, he testified, "I've worked in a lot of environments . . . and I've never seen a situation where . . . an employee talked to another employee of white complexion that way at all. . . . But I have heard individuals talk to black individuals that way." (Veal Dep. at 123:15–124:1.) This allegation falls well short of unlawful discrimination. *See Dykes*, 222 F.Supp.3d at 431; *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 194 (3d Cir. 2015) (noting that plaintiff's subjective belief that a supervisor's statement was offensive and discriminatory "does not suffice for her complaint to qualify as protected conduct").

Even if Scott-Boyes' comments had an implicit connection to race, complaining about a single non-serious incident does not constitute a protected activity. *See Theriault v. Dollar Gen.*, 336 F. App'x 172, 174 (3d Cir. 2009); *Pollard v. George S. Coyne Chem. Co.*, Civ. A. No. 07-3744, 2008 WL 2120710, at *7 (E.D. Pa. May 19, 2008). Likewise, to the extent that Veal complained about being ostracized or subject to "discriminative actions and comments," these generalized complaints of being shunned by coworkers are neither linked to any apparent racial bias nor sufficiently specific to constitute protected activity. *See Atkinson v. N. Jersey Developmental Ctr.*, Civ. A. No. 06-5485, 2010 WL 3947530, at *4 (D.N.J. Oct. 5, 2010), *aff'd*, 453 F. App'x 262 (3d Cir. 2011) ("Plaintiff's ambiguous statement about Defendant's treatment of Plaintiff 'like a racist' due to unspecified 'past incidents' hardly rises to the requisite level of 'protected activity.'").

The Court does not doubt that Veal believed in good faith that he was treated unprofessionally. But the law requires that his complaint be premised on an incident reasonably

thought to be unlawful discrimination. Merely discourteous behavior does not rise to this level. *See Daniels*, 776 F.3d at 195 ("In considering what activities constitute protected conduct, we emphasize that anti-discrimination employment statutes are not intended to establish general standards for conduct of employers in dealing with employees.") Therefore, Veal cannot make out a prima facie case of retaliation.

B.   **Pretext Stage**

Even if the Court were to find that Veal had engaged in a protected activity and established a prima facie case of retaliation, he has not shown that AHAA's legitimate reason for his termination was pretextual and that his firing was actually retaliatory.

Once a plaintiff makes out a prima facie case of retaliation, the burden shifts to the employer to provide a legitimate, non-retaliatory reason for its conduct. *Moore*, 461 F.3d at 342. If the employer can do so, the plaintiff must be able to point to evidence that would allow a factfinder to either disbelieve the employer's proffered reasons or believe that retaliation was more likely than not a determinative cause of the employer's action. *Daniels*, 776 F.3d at 199. The plaintiff may do so by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reason for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted nondiscriminatory reasons." *Id.* The plaintiff does not meet the burden, however, by simply alleging that the employer's decision was "wrong or mistaken." *Id.*

AHAA has provided ample evidence that Veal was fired due to his involvement in several altercations, culminating in him angrily confronting a coworker. The burden therefore

shifts back to Veal, who must now demonstrate that AHAA's justification is pretextual. He cannot.

Veal makes several arguments to show that AHAA's reason for firing him was pretextual. First, Veal points to "increased hostility" from Scott-Boyes following his complaint of racial discrimination. Second, he disputes the underlying incidents with his coworkers that led to his termination. Finally, he contends that AHAA's investigation of the complaints was a sham concocted to justify his firing. The Court will address each of these points in turn.

Veal claims in his brief that Scott-Boyes reacted to his complaint of racial discrimination by not acknowledging him and suggesting to coworkers that she might fire him. (Pl.'s Counter Statement of Material and Disputed Facts ¶ 22.) Veal also alleges that he asked to be transferred to a different department within AHAA, but his request was denied. According to Veal's testimony, however, much of the hostility from Scott-Boyes, including her not acknowledging him and discussing firing him, occurred *before* he complained of racial discrimination. (*See* Veal Dep. at 120:21–121:8 (recalling that Scott-Boyes began to ignore him the day after the initial disagreement, on August 26, 2016), 139:9–140:22 (stating that he overheard Scott-Boyes call him "sensitive" and discuss firing him on August 26, 2016).) Furthermore, he does not provide any evidence that Scott-Boyes actually had any role in AHAA's investigation or his termination. To the contrary, Veal asserts that Scott-Boyes did not give him performance reviews after his complaint. (*See* Pl.'s Counter Statement of Material and Disputed Facts ¶ 22); *cf. Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 263 (3d Cir. 2017) (finding no causal connection between protected activity and adverse employment action where plaintiff did not produce evidence that supervisor "had any meaningful bearing on the ultimate" adverse action); *Dykes*, 222 F. Supp. 3d at 429 (noting that there was no evidence that coworker who had made allegedly

discriminatory remark "was involved in the decision to terminate Plaintiff's employment"). This does not undermine his coworkers' complaints about him and is insufficient to rebut AHAA's proffered legitimate reason for Veal's termination.

Veal also discounts the underlying incidents that gave rise to his firing and complains that he was never told why he was being suspended and ultimately terminated. Simply disputing the legitimacy of coworkers' complaints about the plaintiff's work performance amounts "to little more than the schoolground retort, 'Not so,' an approach which . . . does not create a material issue of fact." *Fuentes*, 32 F.3d at 765. Likewise, arguing that the employer was wrong to fire the plaintiff is insufficient to support a finding of pretext. *See Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 330 (3d Cir. 2015) (noting that evidence "that an employer incorrectly found an employee guilty of misconduct is insufficient to prove retaliation"). Instead, the plaintiff must show that "discriminatory animus motivated the employer." *Fuentes*, 32 F.3d at 765. Veal's rebuttal of his coworkers' accounts fails to do so.

Finally, Veal argues that AHAA's investigation amounted to "making mountains out of molehills" and creating a "paper trail" to justify Veal's termination. (Pl.'s Opp'n to Summ. J. at 17, 19.) To support this argument, Veal notes that AHAA's human resources department asked complaining coworkers to write down their reports of Veal's behavior in an email. He also asserts that the complaints began only after he reported the perceived discrimination, and that there had been none in his first three months of employment.

No reasonable juror could find that this calls into question AHAA's legitimate reason for firing Veal. AHAA was faced with multiple reports of Veal angrily confronting coworkers, resulting in them feeling unsafe. The Company immediately placed Veal on a brief paid suspension while it investigated the allegations, and then terminated his employment. It would

have been irresponsible for AHAA to not record these complaints and investigate. *See Fuentes*, 32 F.3d at 766 ("Given the frequency of employment discrimination suits, an employer which documents its reasons for taking adverse employment actions can often be more suitably described as sensible than as devious."). Furthermore, Veal has not produced any evidence suggesting that AHAA solicited complaints from Veal's coworkers or that it did not believe them to be true. *See id.* at 766–67 (explaining that in evaluating a pretext claim, the question is whether the decisionmaker believed coworkers' complaints about plaintiff to be accurate and relied on them, not whether the underlying complaints were actually true).

Veal has not pointed to any evidence from which a reasonable juror could conclude that his firing was retaliatory. Therefore, Veal's claim also fails at the final stage of the burden-shifting analysis.

## IV. CONCLUSION

Veal has not established a prima facie case of retaliation, nor can he establish pretext. Therefore, AHAA's motion for summary judgment is granted. An Order consistent with this Memorandum will be docketed separately.